## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE DUGAN LAW FIRM, A PROFESSIONAL LAW CORPORATION | CIVIL ACTION |
| VERSUS | NO. 21-1106 |
| KURTZMAN CARSON CONSULTANTS, LLC | SECTION "B"(4) |

### ORDER AND REASONS

Before the Court are defendant and plaintiff-in-counterclaim KCC Class Action Services, LLC ("KCC")'s motion for partial summary judgment (Rec. Doc. 50), plaintiff and defendant-in-crossclaim the Dugan Law Firm, A Professional Law Corporation ("DLF")'s response in opposition (Rec. Doc. 61), DLF's cross-motion for partial summary judgment (Rec. Doc. 62), KCC's response in opposition (Rec. Doc. 72), DLF's reply in support of its cross-motion for partial summary judgment (Rec. Doc. 81), and KCC's reply in support of its motion for partial summary judgment (Rec. Doc. 84).

For the following reasons,

**IT IS ORDERED** that KCC's motion for partial summary judgment (Rec. Doc. 50) is **GRANTED IN PART as to Counts 1 through 5, and DENIED IN PART as to Count 6. Count 3 is only granted to the extent that the $250 break-up fee exists; the fee applies to retained cases DLF instructs KCC to drop, whether due to dismissal or otherwise; and that KCC would waive the fee if instructed to do so**

1

within one month after KCC's completion of its review for proof of product use and injury.[1]

**IT IS FURTHER ORDERED** that DLF's cross-motion for partial summary judgment (Rec. Doc. 62) is **DENIED**.

## I.   FACTS AND PROCEDURAL HISTORY

### A. The Parties and Background

Defendant and plaintiff-in-counterclaim, KCC Class Action Services, LLC ("KCC"), is a provider of administrative services to law firms and other clients in connection with mass tort litigation and settlements. Rec. Doc. 50-1 at 2. Plaintiff and defendant-in-counterclaim, the Dugan Law Firm ("DLF"), is a New Orleans based personal injury law firm specializing in nationwide mass tort litigation. Rec. Docs. 61 and 62-1 at 2.

### B. June 19, 2015 Services Agreement

On June 19, 2015, KCC and DLF entered into a Services Agreement. Rec. Doc. 50-1 at 3; Rec. Docs. 61 and 62-1 at 5. KCC contends that pursuant to the Services Agreement, DLF agreed to pay (a) a fixed fee of $3,250 per claimant regardless of outcome; (b) a $250 break-up fee; (c) fees for additional a la carte services; (d) out-of-pocket expenses incurred while performing the services; and (e) a 1.5% late fee. Rec. Doc. 50-1 at 3-5. As DLF tells it, the pricing scheme invoiced did not match DLF's

---

[1] As to Count 3, Court **DENIES** summary judgment that the break-up fee applies **in addition** to the $3,250 fixed base consulting fee.

expectations when Mr. Dugan signed the Services Agreement. Rec. Docs. 61 and 62-1 at 5-6.

## C. The Ongoing Dispute and Settlement Efforts

According to KCC, in August 2019, KCC advised DLF there were discrepancies in the amounts paid compared to the amounts due. Rec. Doc. 50-1 at 5. Attempts to negotiate a compromise on the outstanding amount were unsuccessful. *Id.* at 6. On December 20, 2020, KCC sent DLF an updated invoice reflecting the amount still owed in several matters, totaling over $2 million. *Id.* KCC further alleges that to date, DLF owes KCC approximately $2.5 million for cases that have not yet settled or been otherwise dismissed, and not yet been invoiced. *Id.*

According to DLF, KCC transmitted the first invoices in July and August 2017 and DLF disputed the pricing by letter. Rec. Doc. 61 and 62-1 at 5. KCC responded that "the new invoice is not consistent with the terms of our contract" and continued to work on DLF's inventory. *Id.* at 6.

In October 2018, KCC sent DLF an invoice totaling approximately $3.5 million for its entire inventory of concluded cases and another $2.3 million in estimated costs for additional ongoing active cases. *Id.* This prompted DLF representatives to meet with KCC in California in December 2018. *Id.* at 6-7. DLF avers that DLF explained to KCC they would only pay for work performed and how certain low-value cases exceeded a claimant's recovery.

3

*Id.* at 7. Following the first meeting, believing the parties were "on the same page," DLF began paying invoices. *Id.* at 7. DLF paid seven invoices in 2019.[2] *Id.* at 7.

In September 2019, DLF claims KCC revised its pricing methodology and invoiced DLF. *Id.* On October 15, 2019, DLF and KCC met again to discuss new invoices. *Id.* at 8. During the meeting, DLF complained the new invoices were incorrect, and left believing the parties were on common ground. *Id.* However, on December 2020, after KCC transmitted nine new invoices for concluded cases that were higher, DLF terminated the relationship and filed for declaratory relief. *Id.*

## II.   LAW AND ANALYSIS

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); *see also TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). A genuine issue of material fact exists if the evidence would allow

---

[2] Invoices were paid in January, May, twice in June, July, and twice in November. Rec. Docs. 61 and 62-1 at 7.

a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court should view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006). Mere conclusory allegations are insufficient to defeat summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

"Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must 'go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.'" *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). "This court will not assume in the absence of any proof that the nonmoving party could or would prove the necessary facts, and will grant summary judgment in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant." *McCarty* 864 F.3d at 358 (internal quotations omitted).

**B. Which Law Applies?**

As a preliminary matter, as this Court sits in diversity jurisdiction, the Court must first apply the choice-of-law rules of the forum state to avoid "disturb[ing] equal administration of justice in coordinate state and federal courts sitting side by side." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Under Louisiana law, contractual choice-of-law provisions are presumed valid unless the chosen law "contravenes the public policy of the state whose law would otherwise be applicable under Article 3537." La. Civ. Code art. 3540; *see also Axis Oilfield Rentals, LLC v. Mining, Rock, Excavation & Constr., LLC*, 166 F. Supp. 3d 684, 690 (E.D. La. 2016).

**1. Contract Formation**

Because DLF contends the choice-of-law provision does not apply to the issue of contract formation, the Court must first consider that argument. Rec. Docs. 61 and 62-1 at 9. DLF is correct that when it comes to contract formation, "'preliminary' issues that pertain to the existence of the choice of law clause, such as consent and vices of consent . . . should be judged according to the law applicable under Article 3537." La. Civ. Code art. 3540, cmt. (d); see also *Axis Oilfield Rentals, LLC,* 166 F. Supp. 3d 684, 690. The text of Article 3537 requires "evaluating the strength and pertinence of the relevant policies of the involved

states" to ascertain which state's law applies. La. Civ. Code Ann. art. 3537. Those factors include:

> (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties;
> (2) the nature, type, and purpose of the contract; and
> (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La. Civ. Code Ann. art. 3537.

In the instant matter, the most significant contacts juxtaposed with binding legal authority weighs in favor of applying Louisiana law for the first issue of whether a contract was formed. It is undisputed that KCC is a California-based company, conducts business operations within California, and included a California choice-of-law provision within the Services Agreement, all of which weigh in favor of applying California rules. Rec. Doc. 50-1 at 8; Rec. Docs. 61 and 62-1 at 9-10. However, KCC also traveled to Louisiana to pitch its services and the parties signed the agreement in New Orleans. Rec. Docs. 61 and 62-1 at 9-10. Second, the parties do not dispute that the elements of contract formation are the same under Louisiana and California law. *Id.* at 10; Rec. Doc. 72 at 3-6 ("Regardless of whether the Court applies Louisiana or California law, pre-contract negotiations and other extrinsic evidence should not be considered in interpreting the clear and

unambiguous terms of the Services Agreement."). Third, DLF raised and KCC has not rebutted the fact that Fifth Circuit authority has considered and found that choice-of-law provisions do not apply when deciding a question of contract formation because "the choice-of-law provision has force only if the parties validly formed a contract . . . if the parties did not enter into a contract, then there is no choice-of-law clause to apply." *Edminster, Hinshaw, Russ & Assocs., Inc. v. Downe Twp.*, 953 F.3d 348, 351 (5th Cir. 2020); *see also Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 531 n.11 (5th Cir. 2020) ("When determining the preliminary question of contract formation, we do not resort to any contractual choice-of-law provision.").

Finding the collective balance weighs in favor of the forum state's laws, the Court thus applies Louisiana law to ascertain only the issue of whether a valid contract was formed. However, the Court would reach the same conclusion under either Louisiana or California law.

### 2. Contract Interpretation

Assuming there exists an enforceable contract and no conflict of laws persist, the Court must then apply California law for the secondary exercise of contract interpretation. For one, the Services Agreement expressly provides: "This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to any choice of law

principles." Rec. Doc. 50-1 at 8 (citing Rec. Doc. 50-3 at 3). What's more, DLF effectively concedes that "[i]f an enforceable contract exists, California law applies to its construction." Rec. Doc. 61 and 62-1 at 18.

## C. Contract Formation

Under Louisiana law, four elements are necessary for an enforceable contract: (1) capacity, (2) consent, (3) certain object, and (4) lawful cause. *See Philips v. Berner*, 2000-0103 (La. App. 4 Cir. 5/16/01), 789 So. 2d 41, 45, *writ denied*, 2001-1767 (La. 9/28/01), 798 So. 2d 119. To determine whether consent exists pursuant to La. Civ. Code art. 1927, "the court must find that there was a meeting of the minds of the parties." *Id.* (citing *Buruzs v. Buruzs,* 96-1247 (La.App. 4 Cir. 12/27/96), 686 So.2d 1006). Additionally, "where there is no meeting of the minds between the parties the contract is void for lack of consent." *Id.; see also Stockstill v. C.F. Industries, Inc.,* 94-2072 (La.App. 1 Cir. 12/15/95), 665 So.2d 802, 820; *Howell v. Rhoades,* 547 So.2d 1087, 1089 (La.App. 1 Cir.1989). "A party who demands performance of an obligation must prove the existence of the obligation" while a "party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction." La. Civ. Code art. 1831.

9

Pointing to a 1958 Louisiana Supreme Court decision, DLF urges the Court to consider extrinsic evidence, namely the "surrounding facts and circumstances" concerning the contract negotiations and conduct following the signing of the Services Agreement. Rec. Docs. 61 and 62-1 at 13-17 (citing *Tessier v. La Nasa*, 234 La. 127, 133, 99 So. 2d 56, 58 (1958)). DLF similarly relies upon a Louisiana Third Circuit Court of Appeal case for the idea that evidence may be admitted to prove such circumstances such as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement. Rec. Docs. 61 and 62-1 at 12 (citing *Mark A. Gravel Properties, LLC v. Eddie's BBQ, LLC*, 2014-46 (La. App. 3 Cir. 5/7/14), 139 So. 3d 653, 657). As DLF sees it, the parties' conduct during negotiations and after the signing of the Services Agreement would yield only one conclusion, that no meeting of the minds occurred as to the pricing structure. Rec. Docs. 61 and 62-1 at 12-17.[3]

---

[3] The Court finds the parties' briefing on contract formation and mutual assent unpersuasive. First, as discussed above, because the Court may only consider Louisiana law for the narrow issue of contract formation, it renders the inclusion of California authority on this section moot. Rec. Docs. 61 and 62-1 at 10-17; Rec. Doc. 72 at 3-5; Rec. Doc. 81 at 4-5. Second, as some of DLF's relied upon authority concern purely oral contracts, which is factually inapposite to the instant case, the Court need not consider those arguments. Rec. Doc. 72 at 4-5; *see also* Rec. Doc. 81 at 5. Finally, because the remaining cases only consider extrinsic evidence after determining a contract was in-fact formed, and because the next issue of contract interpretation is governed by California law as stipulated by the Services

Under Louisiana law, extrinsic evidence is generally inadmissible to contradict an integrated contractual instrument, with minor exceptions:

> Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement.

La. Civ. Code art. 1848. However, "[t]estimonial proof may be used against a writing to show error, fraud, or duress." La. Civ. Code art. 1848, cmt. (b).[4] Where there is unilateral error, "there is theoretically no meeting of the minds." *Broyles v. Ducote*, 2021-0852 (La. App. 1 Cir. 6/14/22), 343 So. 3d 902, 912 (La. Civ. Code art. 1948). Nevertheless, "granting relief to the party in error will unjustly injure the interest of the other party if he is innocent of the error." *Id.* To that end, "Louisiana courts have often refused relief for unilateral error for this reason unless the unilateral error was known or should have been known to the other party as the reason or principal cause why the party in error made the contract." *Id.*

---

Agreement, the Court need not consider that Louisiana authority. Rec. Docs. 61 and 62-1 at 11-12; Rec. Doc. 72 at 5-6.
[4] As neither fraud nor duress is alleged by either party, the Court only considers whether error renders the contract unenforceable. *See generally* Rec. Docs. 61 and 62; *see also* Rec. Doc. 81 at 4.

Mr. James Dugan is, by his own admission, a sophisticated mass tort attorney. Rec. Doc. 62-2 at 1. Further, it is undisputed that the parties signed the Services Agreement on June 15, 2015. Rec. Doc. 50-1 at 3; Rec. Doc. 61 and 62-1 at 5. Although some Louisiana courts have found that the lack of a written contract may overcome parties' sophistication, education, and experience, that is not what transpired here. *See e.g. Bayou Rapides Corp. v. Dole*, 2014-906 (La. App. 3 Cir. 5/27/15), 165 So. 3d 373, 378 (concluding no meeting of the minds occurred because although both plaintiff and defendant "are sophisticated, experienced, educated parties," "the record reveals there was no written contract governing the parties' rights and obligations").

Here, Mr. Dugan was authorized to sign the Services Agreement on behalf of DLF in his role as President of DLF. Rec. Doc. 50-6 at 8. What's more, when reviewing the Services Agreement, Mr. Dugan also initiated the bottom of each page. *Id.* at 7. Finally, Mr. Dugan made handwritten notations on the Fee Structure segment of the Services Agreement, before including his initials next to said modifications. *Id.* at 8; *see also* Rec. Doc. 50-3 at 7-8. Mr. Dugan had every opportunity to clarify the language before signing, but alas, he did not. In light of these undisputed facts, DLF has not proffered sufficient evidentiary support that KCC knew or should have known of any alleged error, so that it would sustain DLF's meeting of the mind contention. *Broyles*, 343 So. 3d at 912.

12

Given the cumulative nature of this extrinsic evidence, viewed in the light most favorable to KCC, the Court agrees with KCC's position that a meeting of the minds occurred, and a contract was formed. Rec. Doc. 72 at 3; *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 98-0193 (La. App. 4 Cir. 9/30/98), 720 So. 2d 372, 373 ("The fact that a whole day of negotiations was capped off by the signing of a document which memorialized the agreement between the parties signifies that there had been a meeting of the minds. Otherwise, the document would not have been signed, particularly considering who signed.").

Finding an enforceable contract was formed, the Court must deny DLF's cross-motion for summary judgment (Rec. Doc. 62) and shift to California law in its exercise of contract interpretation.

**D. Contract Interpretation**

Having concluded that the Services Agreement is an enforceable contract under Louisiana law, the Court now considers the secondary issue of contract interpretation. As elucidated above, the Court must apply California law in its exercise of contract interpretation as the Services Agreement contains a California choice-of-law clause, and because DLF concedes California law applies only to this discrete issue. Rec. Doc. 50-1 at 8; *see also* Rec. Docs. 61 and 62-1 at 18.

13

Under California[5] law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code. § 1636; *see also Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006)[6] ("The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties"). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone . . ." Cal. Civ. Code § 1639; *see also Perez-Encinas*, 468 F. Supp. 2d at 1133 ("intent is determined solely from the written provisions"). Thus, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638; *see also Perez-Encinas*, 468 F. Supp. 2d at 1133 ("The court must look to the language of the contract in order

---

[5] Louisiana law provides a nearly identical framework for the exercise of contract interpretation. *See Bd. of Supervisors of Louisiana State Univ. v. 2226 Canal St., L.L.C.*, 2018-0254 (La. App. 4 Cir. 12/19/18), 262 So. 3d 909, 914-15 (citing *French Quarter Realty v. Gambel*, 05-0933, pp. 6-8 (La. App. 4 Cir. 12/28/05), 921 So.2d 1025, 1029-30).

[6] Although the *Perez-Encinas* court evaluated an insurance policy, it concluded such policies are inherently contracts and similarly utilize conventional rules of contract interpretation. *Perez-Encinas*, 468 F. Supp. 2d at 1133 ("While insurance contracts may have special attributes, they are nevertheless contracts to which the ordinary rules of contract interpretation apply.").

to ascertain its plain meaning"). "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code. § 1641; *see also Perez-Encinas*, 468 F. Supp. 2d at 1133 ("Language in a contract must be interpreted as a whole, and in the circumstances of the case"). "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." Cal. Civ. Code § 1644; *see also Perez-Encinas*, 468 F. Supp. 2d at 1133 ("In searching for a plain meaning, a court is to interpret the language of an agreement in its 'ordinary and popular sense, unless used by the parties in a technical sense'").

"Courts will not strain to create an ambiguity where none exists." *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006) (citing *Reserve Ins. Co.*, 30 Cal.3d at 807, 180 Cal.Rptr. 628, 640 P.2d 764). "If the [contract] language is clear and explicit, it governs" but if the plain meaning "approach fails to resolve the ambiguities, a court is to look at the objectively reasonable expectations of the policy holder." *Id.* "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code §

1654; *see also Perez-Encinas*, 468 F. Supp. 2d at 1133 ("[i]f the 'reasonable expectations' approach does not resolve the ambiguity, the ambiguity is to be interpreted against the drafter [], since that party caused the ambiguities to exist")(citing *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807, 822, 799 P.2d 1253, 1264 (1990)).

Since DLF asserts the Services Agreement is infected by ambiguities (Rec. Docs. 61 and 62-1 at 18), the Court now conducts a plain meaning evaluation of the contract. Unsurprisingly, KCC's memoranda argues the opposite position, that "the Services Agreement clearly and unambiguously provides DLF agreed to pay (1) a fixed based consulting fee of $3,250 per claimant, which includes an upfront component of fees due before the conclusion of the claimant's case and the remaining deferred amount due upon completion, regardless of the outcome of the case; (2) which is subject to certain specified discounts only in certain limited circumstances; (3) a break-up fee for any retained claimant dropped more than 30 days after KCC's completion of its initial review for proof of product use and injury; (4) proscribed fees for additional a la carte services provided by KCC beyond the Services included in the $3,250 base concluding fee; (5) reimbursement of KCC's out of pocket expenses; and (6) a [sic] 1.5% late fee." Rec. Doc. 50-1 at 10-11.

**1. Does the Services Agreement provide a fixed base consulting fee of $3,250 per claimant?**

16

KCC first urges the Court to find that the Services Agreement unambiguously provides DLF would pay a base fixed fee of $3,250 per claimant, regardless of outcome. Rec. Doc. 50-1 at 10-15. In relevant part, the plain text of the Services Agreement clarifies:

> KCC charges $3,250 per claimant who retains Client for consulting, management, tax, accounting and expert services. The majority of this fee shall be deferred until the conclusion of the claimant case as set forth below.

Rec. Doc. 50-3 at 7. Additionally, the Services Agreement also notes "[t]he remaining portion of any Deferred Fee Amount (as set forth in the Fee Structure) shall be paid by Client at the conclusion of the retained case, whether by settlement, verdict, dismissal or otherwise." *Id.* at 4.

Given the clear language of the Services Agreement as to this particular term, the Court **GRANTS** partial summary judgment to the first of KCC's requested relief, that DLF agreed to pay a base fixed fee of $3,250 per claimant, regardless of outcome.

**2. Does the Services Agreement provide that the $3,250 per claimant base fee is subject to five limited discounts?**

Second, KCC argues "[t]he $3,250 per claimant fixed base consulting fee for all claimants is subject to the following discounts only" before listing them as follows: (a) a $500 discount if DLF already obtained a signed retainer agreement, (b) a $500 discount if DLF ordered medical records and verified product use and injury, (c) a $250 discount if DLF already obtained the medical records that were reviewed by KCC for product use and injury, (d)

a $500 discount if DLF already prepared a Plaintiff Fact Sheet; and (e) a $500 discount if the court appointed a lien resolution provider in any given matter. Rec. Doc. 50-1 at 1.

> In relevant part, the Services Agreement provides:
>
> For cases where Client has already been retained and is transferring the matter to KCC for administration, KCC will discount its $3,250 per claimant fees as follows: (1) $500 discount if Client has already obtained a retention agreement; (2) $500 discount if Client has ordered medical records and verified product use and injury; 3) $250 discount if Client has obtained medical records and KCC handles the review for proof of use and injury; and (4) $500 discount if Client has prepared the plaintiff fact sheet. All other fees and expenses detailed herein shall apply.

Rec. Doc. 50-3 at 8. Additionally, it is undisputed that the parties handwrote and signed an additional provision: "KCC will agree to reduce its [sic] $3,250.00 or per claimant fee by $500 if there is a court appointed lien resolution provider." *Id.*

Given the clarity of the agreed-upon contractual language plainly spelling out the applicable discounts, the Court **GRANTS** partial summary judgment as to KCC's second request relief, that the Services Agreement provides the base $3,250 fee is subject to five circumstantial discounts. Rec. Doc. 50-1 at 15-16.

### 3. Does the Services Agreement contain a $250 break-up fee, in addition to the $3,250 fixed base fee?

Third, KCC insists a "$250 Break-Up Fee applies in addition to the $3,250 fixed base consulting fee for any claimant DLF instructs KCC to drop more than 30 days after the initial review

for proof of product use and injury." Rec. Doc. 50-1 at 2. In relevant part, the Services Agreement provides:

> Client will pay a $250 break-up fee (the "Break-Up Fee") for any Retained Case that it instructs KCC to drop, whether due to dismissal or otherwise, from Client's inventory of Retained Cases. To the extent that a Retained Case is dropped within one month after KCC's completion of its review for proof of product use and injury, the Break-Up Fee will be waived by KCC.
>
> For example, if KCC completes the review for proof of product use and injury and Client instructs KCC to drop the Retained Case within one month, the Case Review Fee would be waived but Client would pay KCC the Break Up Fee (for a total of $750 for the Retained Case). If Client instructs KCC to drop a Retained Case prior to the completion of the use and injury review, the Break-Up Fee shall apply (for a total of $750 for the Retained Case). If the Retained Case moves forward after completion of the use and injury review but is later dropped by Client for any reason Client will pay the Break-Up Fee to KCC (for a total of $1,250 for the Retained Case).

Rec. Doc. 50-3 at 7.

It appears to the Court, based upon the plain text of the contractual language and the accompanying elaboration, that the $250 break-up fee only applies in two situations. First, it applies where DLF instructs KCC to drop a case, whether due to dismissal or otherwise. *Id.* at 7. Second, the break-up fee will be waived if a Retained Case is dropped within one month after KCC's completion of its review for proof of product use and injury. *Id.* That much is clear.

However, KCC's argument that the break-up fee applies "in addition to the $3,250 base consulting fee" is unfounded. Rec. Doc. 50-1 at 16. Perhaps KCC meant to say that, depending on when

a claimant is dropped, the total could be either $750 or $1,250.[7] Rec. Docs. 61 and 62-1 at 21. In either situation, the contractual text is clear that the $250 break-up fee, when applicable, would supplant the $3,250 base fee, though DLF would still be required to pay either the Retained Case Fee or Review Fee, and perhaps both. Rec. Doc. 50-3 at 7.

Given the clarity of the Services Agreement, the Court **GRANTS** KCC's third requested relief, only to the extent that the $250 break-up fee exists; the fee applies to retained cases DLF instructs KCC to drop, whether due to dismissal or otherwise; and that KCC would waive the fee if instructed to do so within one month after KCC's completion of its review for proof of product use and injury. However, the Court emphatically **DENIES** summary judgment that the break-up fee applies **in addition** to the $3,250 fixed base consulting fee. Rec. Doc. 50 at 2 (emphasis added).

### 4. Does the Services Agreement contain proscribed fees for additional a la carte services?

Next, KCC contends the Services Agreement contains proscribed fees for additional "a la carte" services. In relevant part, the contract states:

> KCC will provide any of the services described herein on an a la carte basis. The pricing for such services depends on

---

[7] Under one possible scenario, DLF would be required to pay $750, which consists of the $250 break-up fee and $500 case review fee. Rec. Doc. 50-3 at 7. In another instance, DLF would be required to pay $1,250, which consists of the $250 break-up fee, the $500 Case Review Fee, and $500 Retained Case Fee. *Id.*

part on the volume, but the following is a general framework
for our services:

Intake Services - $5 per lead plus $100 per retained case
Medical Record Retrieval and Review - $500 per case
Plaintiff Fact Sheets - $500 per case
Qualified Settlement Fund and Escrow - $1,000 per account
Lien Resolution - $500 per case

Rec. Doc. 50-3 at 8. It is also undisputed that the parties
handwrote and signed the following: "KCC will agree to reduce its
[sic] $3,250.00 or per claimant fee by $500 if there is a court
appointed lien resolution provider." *Id.*

Pointing specifically to the "Medical Record Retrieval and
Review" and "Plaintiff Fact Sheets," DLF seemingly argues that
some of the listed prices under the a la carte segment of the
contract are redundantly listed because they appear as part of the
$3,250 base fee. Rec. Docs. 61 and 62-1 at 19-20. While DLF's
argument on this point is strong, we disagree. KCC appears to
insert a fee for almost everything imaginable for its "consults".
However, a careful reading of the Services Agreement explains the
$3,250 base fee does not include an express listing of the services
listed under the a la carte section. Rec. Doc. 50-3 at 7-8. Thus,
with some initial reluctance, the Court **GRANTS** KCC's request for
partial summary judgment as to the fourth issue, that the Services
Agreement unambiguously contains proscribed fees for additional a
la carte services.

5. **Does the Services Agreement provide for reimbursement of
   KCC's out of pocket expenses?**

As DLF does not dispute the fifth request, reimbursement of KCC's out-of-pocket expenses, the Court need not address this point. Rec. Doc. 81 at 10 ("If the Court concludes that an enforceable contract was formed, DLF agrees it owes reasonable expenses as stated in its Supplemental Response to KCC's Request for Admission No. 11").

As noted above, an enforceable contract exists pursuant to Louisiana law. Thus, the Court **GRANTS** partial summary judgment as to the fifth request, that the Services Agreement provides for reimbursement of KCC's out-of-pocket expenses. Rec. Doc. 50-3 at 8 ("KCC will bill for out-of-pocket expenses such as medical record copy charges, FedEx and Postage, travel (if required by Client), stationary (if specialized) and storage (if paper copy storage is required offsite). Such costs will be tracked and allocated to individual Retained Cases.").

### *6. Does the Services Agreement provide a 1.5% late fee?*

Finally, KCC contends a "1.5% late fee is owed by DLF on a compounding basis every 30 days on all unpaid fees that were due on the dates outlined in the Services Agreement but were not paid within 30 days." Rec. Doc. 50 at 2. The Court disagrees with KCC's reading because more than one interpretation is possible. The Services Agreement provides the following framework:

> If any amount is unpaid as of thirty (30) days from the date due hereunder, Client agrees to pay a late charge, calculated

as one and one-half percent (1-1/2%) of the total amount
unpaid every thirty (30) days.

Rec. Doc. 50-3 at 4.

Although KCC adds the word "compounded" in its memoranda (Rec.
Doc. 50-1 at 19), the contract does not include that word. *See
generally* Rec. Doc. 50-3. Thus, it is unclear to the Court whether
the contract demands a repeating 1.5% late fee of the amount due
every thirty-days, or if the 1.5% late fee is compounded as KCC
avers. Under California law, in cases of uncertainty, "the language
of a contract should be interpreted most strongly against the party
who caused the uncertainty to exist." Cal. Civ. Code § 1654; *see
also Perez-Encinas*, 468 F. Supp. 2d at 1133. Because the absence
of one word, even if seemingly minor, renders this aspect of the
contract possible to two interpretations, the Court **DENIES** KCC's
sixth requested relief as to partial summary judgment on the issue
of a compounded 1.5% late fee.[8]

### E. Modification or Waiver

Finally, DLF asserts that even if the Court interpret the
Services Agreement's terms in favor of KCC, genuine issues of
material fact exist regarding whether those terms were modified by
waiver or the parties' subsequent conduct. Rec. Docs. 61 and 62-1
at 22. However, KCC is correct that under California law, "**Unless
the contract otherwise expressly provides**, a contract in writing

---

[8] Since the controlling law here is so clear, KCC's argument treaded the line between reasonable and unreasonable.

may be modified by an oral agreement supported by new consideration." Cal. Civ. Code § 1698(c) (emphasis added). Here, § 1698(c) controls because the Services Agreement includes an oral modification preclusion clause. In relevant part, the contract clarifies:

> This Agreement constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof. If any provision herein shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby. **This Agreement may be modified only by a written instrument duly executed by the parties.** All of the terms, agreements, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors and permitted assigns.

Rec. Doc. 50-3 at 6 (emphasis added). It is clear from the provision in the Services Agreement quoted above that the agreement precludes oral modifications claimed by DLF. *See also Davidson v. ConocoPhillips Co.*, No. C08-1756 BZ, 2009 WL 2136535, at *4 (N.D. Cal. July 10, 2009) (explaining Section 1698(c) allows oral modification of a written contract only if "the written contract does not contain an express provision requiring that modification be in writing.") (citing *Marani v. Jackson,* 183 Cal.App.3d 695, 704 (1986)). DLF lists several interactions between the parties after the signing of the contract (Rec. Docs. 61 and 62-1 at 23-25), but none of them meet the criteria required to modify an

integrated instrument under § 1698(c). Because the Services Agreement specifically demands modification by a written instrument, and there's no record of any such instrument, the Court must reject an oral modification argument.

New Orleans, Louisiana this 23rd day of January, 2023

_____

SENIOR UNITED STATES DISTRICT JUDGE